**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

RW Norfolk Holding, LLC

    v.                                          Civil No. 17-cv-370-LM
                                                      Opinion No. 2017 DNH 231

CBRE, Inc. and United
States Postal Service

## **O R D E R**

RW Norfolk Holding, LLC ("Norfolk"), brings suit against CBRE, Inc. ("CBRE") and the United States Postal Service, alleging several claims arising out of the Postal Service's solicitation of bids and selection of a winning bid for the purchase of a Postal facility at 345 Heritage Avenue in Portsmouth, New Hampshire (the "property").[1] Norfolk seeks money damages and both preliminary and permanent injunctive relief to prevent the Postal Service from selling the property to another bidder.

After Norfolk filed its original complaint, the Postal Service nullified its selection of a winning bid, and terminated the first bidding process. The Postal Service subsequently issued a new solicitation for offers on the property, and set a deadline for the submission of offers for October 18, 2017.

---

[1] CBRE was the Postal Service's broker for the sale of the property.

On October 5, 2017, Norfolk filed a motion for a temporary restraining order (doc. no. 8), seeking to enjoin the Postal Service from receiving offers for or selling the property. Norfolk subsequently filed an amended motion for a temporary restraining order (doc. no. 16) and an amended complaint. The Postal Service and CBRE object to the amended motion for a temporary restraining order.

On October 12, the court held a hearing on Norfolk's amended motion for a restraining order. At the close of the hearing, the court orally denied the motion from the bench. This order sets forth in more detail the basis for that ruling. See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 (D.N.H. 2014) (noting a district court's authority to later reduce its prior oral findings and rulings to writing).

### Background[2]

In June 2011, the Postal Service awarded CBRE a contract to be its sole provider of real estate management services. As part of that contract, CBRE acts as the Postal Service's agent for its "disposal program," which is "a program to sell properties that are no longer required for postal operations, that may include the entire property, or part of a property."

---

[2] The facts in this section are drawn from Norfolk's amended complaint (doc. no. 17) and evidence submitted during the October 12 hearing.

At some point prior to December 23, 2016, the Postal Service engaged CBRE to sell, pursuant to its disposal program, the property located at 345 Heritage Avenue in Portsmouth, New Hampshire.

I.   The First Solicitation of Bids

On December 23, 2016, CBRE representative Ken White emailed Michael Kane, Norfolk's principal, informing him of the Postal Service's intended sale of the property.  CBRE's marketing materials for the property included the following advisory:

> CBRE, Inc. operates within a global family of companies with many subsidiaries and/or related entities (each an "Affiliate") engaging in a broad range of commercial real estate businesses including, but not limited to, brokerage services, property and facilities management, valuation, investment fund management and development.  At times different Affiliates may represent various clients with competing interests in the same transaction.  For example, this information may be received by our Affiliates, including CBRE Investors, Inc. or Trammell Crow Company.  Those, or other, Affiliates may express an interest in the Property described and may submit an offer to purchase the Property and may be the successful bidder for the Property.  You hereby acknowledge that possibility and agree that neither CBRE, Inc. nor any involved Affiliate will have any obligation to disclose to you the involvement of any Affiliate in the sale or purchase of the Property.

Doc. no. 17 at ¶ 17.  CBRE's marketing materials also included the following:

> In all instances, however, CBRE, Inc. will act in the best interest of the client(s) it represents in the transaction and will not act in concert with or otherwise conduct its business in a way that benefits

3

> any Affiliate to the detriment of any other offeror or prospective offeror, but rather will conduct its business in a manner consistent with the law and any fiduciary duties owed to the client(s) it represents in the transaction.

Id.

The original deadline for offers was set for June 1, 2017 at 4:00 p.m. Norfolk submitted a timely bid for $6.6 million, which included certain leaseback provisions. White and a Norfolk representative were in contact regarding Norfolk's bid over the first week of June, during which White informed the representative that Norfolk's bid was not the highest but was competitive. White also asked that Norfolk resubmit its bid by 4:00 p.m. on June 22.

On June 20, White sent Kane a text message informing him that there had been a difference of $275,000 in the top bids previously submitted. Kane responded with a text message asking if Norfolk had the highest bid, and White responded that Norfolk was "definitely in the mix."

White subsequently extended the deadline for bidding on the property until June 26 at 4:00 p.m. At approximately 1:41 p.m. on June 26, Kane received a voicemail from another bidder, informing Kane that he understood that he and Norfolk had been two of the finalists in the bidding on the property and that he did not intend to increase his most recent bid of about $6.4 million. Kane returned the call, and learned that Norfolk was

4

the highest bidder in the first round, that the next highest bidder had offered $6.375 million, and that the next highest bidder had offered approximately $6.325 million. The caller also informed Kane that he had received the bid information from White, with whom the caller has a pre-existing business relationship.

About an hour before the 4:00 p.m. deadline on June 26, Norfolk submitted to White a bid in the amount of $6.95 million. At some point over the next two days, White had a conversation with another of Norfolk's principals. Norfolk alleges that during that conversation, White "insinuated" that Norfolk had submitted the winning bid for the property.

On June 28, White spoke to Kane and informed him that Norfolk had not submitted the highest bid for the property and that he could not disclose the amount of the winning bid. Later that day, Kane called the same bidder who had called him with information about the original round of bids. The bidder congratulated Kane and called him the "seven million dollar man," believing Norfolk had won the bid for the property at $7 million. Kane informed the bidder that Norfolk had not won the bid.

On June 29, White forwarded to Norfolk an email he had received from Brent Davidson, an employee in CBRE's Washington

5

D.C. office, explaining that Norfolk was not the winning bidder on the property. The email read, in relevant part:

> Please let RW Norfolk know we appreciate their interest in purchasing 345 Heritage Ave. USPS utilizes a defined sale and bid process to ensure that all interested parties are afforded equal opportunity to purchase USPS assets. The bidding process for 345 Heritage has concluded and a winning bidder has been selected. On CBRE's behalf please thank RW Norfolk for their participation, and we wish them luck with their future endeavors.

Doc. no. 17 at ¶ 30. White also called Kane to tell him that Norfolk had been outbid, and that although he could not disclose the amount of the winning bid, it was less than $100,000 more than Norfolk's bid.

After Kane spoke to White, Kane sent the following email to White and Davidson:

> Upon receiving your email that you were shutting down the bidding process and that the price difference went from a spread of $225,000 and $275,000 respectively to a spread of $50,000 between us and the higher bid and the lower bid being $550,000 lower. We were confused and disappointed because it was never stated that this was the final round. When we spoke, Brent, you confirmed for me that this last round of bidding was not necessarily the final round and that it was the goal of the USPS to get the highest bid. As such we are attaching our final and best offer of $7,418,000.

Doc. no. 17 at ¶ 31. On June 30, Kane sent the following email to Davidson requesting that no further action be taken with another prospective purchaser until the Postal Service had an opportunity to respond to Norfolk's bid of $7,418,000:

6

> Attached below I am forwarding the email I received yesterday from Kent after we submitted our offer of $7,418,000. We submitted that offer to you as well as Kent. I assume by reading this email that our offer has been submitted to USPS. We have called you a couple of times but have not heard back. I am writing to request confirmation that no further action will be taken with another prospective buyer until USPS has had the opportunity to consider our offer. I am certain that the government would like to get the best possible price for this property.
>
> Additionally, Brent, in your email to us you referenced that the "USPS utilizes a defined sale and bid process to ensure that all interested parties are afforded equal opportunity to purchase USPS assets." To date I have not seen or received a copy of this defined sale and bid process. As such, under the Freedom of Information Act I am hereby requesting all information related to this transaction.
>
> I look forward to hearing from you.

Id. at ¶ 32.

A few hours later, Norfolk received CBRE's final response:

> As we just discussed I did connect with Brent and confirmed that he forwarded your attached revised offer to USPS. He informed me USPS provided the following response. USPS appreciates your revised offer and will consider the offer in the event the selected Buyer does not perform on the terms of their offer.
>
> As communicated previously USPS reviewed all offers from both rounds of bids and ultimately selected the offer they felt was best.
>
> As it relates to the Freedom of Information Act, you may contact USPS directly thru their website which has a FOIA section.
>
> Again, sorry your bid was not selected. If something changes I will let you know. Enjoy the long weekend.

Id. at ¶ 33.

II.  <u>Norfolk Files Suit</u>

On August 21, 2017, Norfolk instituted this action, seeking a declaratory judgment that it be declared the winning bidder for the property and seeking preliminary and permanent injunctive relief to prevent the Postal Service from transferring the property to the declared winning bidder. Norfolk also brought a claim against the Postal Service for violation of the Administrative Procedure Act and several state-law claims against CBRE.  That same day, Norfolk filed a motion for a temporary restraining order and preliminary injunction.

On September 8, 2017, Norfolk filed a notice of withdrawal of its motion for a temporary restraining order and preliminary injunction.  In its notice, Norfolk stated that the Postal Service was not proceeding with the sale of the property to the unidentified bidder, and that the Postal Service had informed Norfolk that if it proceeded with a sale of the property, it would issue a new call for offers to the market and would provide advance notice to Norfolk's counsel.  The notice of withdrawal also stated that Norfolk believes it is entitled to purchase the property at $6,950,000, the amount it bid prior to the deadline, and that "if Norfolk's counsel receives notice that USPS intends to sell the Property pursuant to a new call for offers, Norfolk will file a new motion for TRO to enjoin the process."  Doc. no. 7 at ¶ 4.

III. The Second Solicitation of Bids

On October 5, 2017, Norfolk filed a second motion for a temporary restraining order, asserting that the Postal Service had issued a new call for offers on the property and seeking to enjoin that process. Norfolk represented in its motion that the deadline for the submission of offers on the second bidding process was October 18, 2017, and requested an expedited hearing on the motion. The court scheduled a hearing for the morning of October 12.

On October 11, Norfolk filed an amended motion for a temporary restraining order (doc. no. 16) and an amended complaint (doc. no. 17). In the amended complaint, Norfolk alleged that the second bidding process was tainted because White had recently told another bidder the Postal Service had received bids "well in excess of $7 million" during the previous round of bids, which demonstrated that White was sharing confidential bid information. Norfolk also alleged that the terms of the new solicitation were substantially different than the terms of the first solicitation, and that the current terms precluded Norfolk from getting financing to submit a bid. In addition, the amended complaint removed the claim against the Postal Service for violation of the Administrative Procedure Act and instead asserted a claim against it for breach of implied

9

contract.  CBRE and the Postal Service objected to Norfolk's amended motion for a temporary restraining order.

On October 12, 2017, the court held a hearing on Norfolk's motion.  At the conclusion of the hearing, the court denied the motion from the bench.  The court provides additional analysis for that ruling below.

**Discussion**

In evaluating a motion for a temporary restraining order, the court considers the same four factors that apply to a motion for preliminary injunction: the likelihood the movant will succeed on the merits, whether the movant is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities, and whether an injunction is in the public interest.  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Bl(a)ck Tea Soc'y v. City of Bos., 378 F.3d 8, 11 (1st Cir. 2004).  The court assesses each of these four elements separately, mindful that the burden of satisfying them rests and remains with the party seeking the injunction.  Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

I. Likelihood of Success on the Merits

"Though each factor is important . . . 'the sine qua non of [the] four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (alteration omitted)). "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail." Sindicato Puertorriqueño, 699 F.3d at 10 (internal quotation marks and citations omitted). In the context of a preliminary injunction, "the merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks and citation omitted).

In its amended motion for a temporary restraining order, Norfolk addresses its likelihood of success on the merits of only its breach of implied contract claim against the Postal Service. See doc. no. 16-1 at 1 ("Norfolk is likely to prevail on the merits of its claim that USPS breach its implied contract

11

of providing an honest and fair process pursuant to 28 U.S.C. § 1491(a) for selling the property located at 345 Heritage Avenue, Portsmouth, New Hampshire."). Therefore, the court addresses Norfolk's likelihood of success on the merits on only that claim.

Norfolk argues that the Postal Service had an implied contract with Norfolk to have an honest and impartial bid process. It contends that the Postal Service breached that implied contract during the first solicitation process when CBRE failed to follow an established protocol or process, shared confidential bid information with potential bidders other than Norfolk, and failed to use the usual process for receiving best and final offers. Norfolk also argues that the breach has continued through the second solicitation because CBRE shared confidential bid information with another potential bidder.

In addition, likely anticipating a jurisdictional challenge from the Postal Service, Norfolk argues that it is likely to show that this court has jurisdiction over its breach of implied contract claim.[3] The court addresses the jurisdictional issue first, before turning to the parties' arguments on the merits. See Pagan v. Calderon, 448 F.3d 16, 26 (1st Cir. 2006) ("A

---

[3] Defendants indeed argued in their objection and at the October 12 hearing that the court did not have jurisdiction over the claim asserted against the Postal Service in the amended complaint.

federal court must satisfy itself as to its jurisdiction . . . before addressing his particular claims . . . .").

A. Jurisdiction

Norfolk alleges that it is entitled to a declaratory judgment "pursuant to 28 U.S.C. § 1491(a)(1) because of the implied contract between USPS and bidders on the sale of government property to have their bids fairly and honestly considered." Doc. no. 17 at ¶ 56. In its motion for a temporary restraining order, Norfolk acknowledges that § 1491, known as the "Tucker Act," ordinarily requires that challenges to a bidding process for a government contract, including those based on a theory of breach of an implied contract, must be brought in the Federal Court of Claims. Norfolk argues, however, that this court has jurisdiction over its breach of implied contract claim because this bidding process was a "nonprocurement solicitation." Norfolk contends that challenges to such solicitation processes can be heard in district court.

Norfolk's argument is without merit. Norfolk's amended complaint and amended motion for a temporary restraining order specifically state that its breach of implied contract claim against the Postal Service falls under § 1491(a)(1) of the Tucker Act. "Under the Tucker Act, the Court of Federal Claims has jurisdiction 'to render judgment upon any claim against the

13

United States founded . . . upon any express or implied contract with the United States.'" Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) (quoting § 1491(a)(1)). The Court of Federal Claims' jurisdiction over such claims is exclusive. E. Enters. v. Apfel, 524 U.S. 498, 520 (1998).

In other words, the plain language of the Tucker Act requires that any claim that falls under § 1491(a)(1) be brought in the Court of Federal Claims. Thus, to the extent the Tucker Act applies to Norfolk's breach of implied contract claim, as Norfolk alleges, the Court of Claims has exclusive jurisdiction to hear that claim.[4] Therefore, Norfolk has not shown that it is likely to succeed in showing that this court has jurisdiction over its implied contract claim.[5]

---

[4] Norfolk relies on two cases to support this court's jurisdiction over its implied contract claim: Resource Conservation Group, LLC v. United States, 597 F.3d 1238 (Fed. Cir. 2010) and Creation Upgrades, Inc. v. United States, 417 F. App'x 957 (Fed. Cir. 2011). Those cases support the existence of the Court of Claims' exclusive jurisdiction to hear a claim that is subject to § 1491(a)(1).

[5] Because Norfolk alleges in its amended complaint and argues in its amended motion for a temporary restraining order that this court has jurisdiction over its claim against the Postal Service under the Tucker Act, the court does not address any other potential basis for jurisdiction over the Postal Service.

14

B.  Merits of the Claim

Even if Norfolk had carried its burden to show that this court has jurisdiction over its breach of implied contract claim, Norfolk has not shown that it is likely to succeed on the merits of that claim.  Norfolk argues that the Postal Service, through CBRE:

> breached the implied contract to conduct a fair and honest bid process during the first solicitation by (a) failing to follow a fair and established protocol or process; (b) sharing confidential bid information with potential bidders other than Norfolk; (c) failing to use the usual call for offer and call for best and final offers process; (d) leading Norfolk to believe that its June 26 offer would not be a last and best offer.

Doc. no. 16-1 at 3-4.

Assuming the truth of those assertions, Norfolk fails to explain how those facts entitle Norfolk to injunctive relief preventing the Postal Service from accepting offers to purchase the property pursuant to the second solicitation.  As discussed, the Postal Service terminated the first solicitation and, therefore, a request for injunctive relief to prevent that solicitation is moot.  See, e.g., CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 559 (2000) ("[B]y canceling the solicitation, the Navy already has provided Carlson with relief from any allegedly excessive requirements in the challenged solicitation.  There is no other injunctive or declaratory relief that this court could award under this solicitation,

precisely because it was canceled." (internal citations omitted)).

Norfolk nevertheless contends that it is likely to succeed on its claim against the Postal Service because the "breach has continued through the second solicitation because USPS's agent, CBRE, shared confidential bid information with another potential bidder." Doc. no. 16-1 at 4. According to Norfolk, the "confidential bid information" is that the Postal Service "had received bids 'well in excess of $7 million' during the previous round of bids." Doc. no. 17 at ¶ 54.

There are several reasons why Norfolk has failed to show that it will succeed on its breach of implied contract claim with regard to the second solicitation. The first is that Norfolk has not explained adequately why CBRE was precluded from sharing bid information. Norfolk alleges that by disclosing Norfolk's bid amount to other bidders, CBRE violated its "USPS contract, the defined bid and sale process, and New Hampshire law." Id. at ¶ 29. Norfolk fails to explain, however, how CBRE's alleged breach of its contract with the Postal Service could give rise to a claim on behalf of Norfolk. Nor does Norfolk point to any confidentiality obligation imposed by the "defined bid and sale process," or how CBRE's alleged sharing of bid information violates New Hampshire law. Even if such confidentiality obligations existed, Norfolk does not explain

16

how they would have prevented CBRE from sharing information from the first solicitation to bidders in the second solicitation.

But Norfolk's argument fails for a much simpler reason: Norfolk specifically alleged in its first complaint that the winning bid under the first solicitation was for $7 million, and that it has subsequently bid more than $7.4 million. Norfolk's first complaint was filed before the second solicitation for bids. Thus, the fact that there were bids in excess of $7 million in the first solicitation was far from confidential information—instead, it was made public by Norfolk's own filing.

As a last ditch effort, Norfolk alleges that the "terms of the new solicitation are substantially different from the first solicitation," and that the new terms "render[] the project unfinanceable" Doc. no. 17 at ¶¶ 49, 51. It further alleges that the new solicitation provides that the Postal Service reserves the right to modify the lease terms with the winning bidder. During the hearing, Norfolk argued that these changed bid terms and ability to modify the terms after a winning bidder is selected necessarily favor certain bidders who may receive assurances that the terms will be changed after a successful bid, but disadvantage others, such as Norfolk, who receive no such assurances.

Norfolk's theory is unconvincing because the terms of the second solicitation are not substantially different from the

17

first solicitation; in fact, they are nearly identical.  During the October 12 hearing, counsel for the Postal Service produced a May 18, 2017 email between White and Dan Fallon, head of the real estate development company affiliated with Norfolk.  In that email, White provided the terms of the first solicitation.  With minor inconsequential differences, the terms are identical to the terms of the second solicitation.  Norfolk specifically alleges in its amended complaint that this information was provided to Kane.  Therefore, Norfolk's suggestion that the terms of the second solicitation were somehow unfair to certain bidders is without merit.

For those reasons, Norfolk has not shown that it is likely that this court has jurisdiction over its breach of implied contract claim or that it is likely to succeed on the merits of that claim.

## II.  Remaining Factors

Although CBRE and the Postal Service make several other persuasive arguments as to why Norfolk is not entitled to a temporary restraining order, the court need go no further.  Because Norfolk has not shown a likelihood of success on the merits, it is not entitled to a temporary restraining order.

## Conclusion

For the foregoing reasons and as stated on the record, Norfolk's amended motion for a temporary restraining order (doc. no. 16) is denied.

SO ORDERED.

_____
Landya B. McCafferty
United States District Judge

October 25, 2017

cc: Counsel of Record